IN RE WILL OF LOTTIE R. HAGAN.

VALLEY SAVINGS BANK, Trustee, Appellee, v. PENN COLLEGE et al., Appellants; DRAKE UNIVERSITY, Appellee.

No. 46514.

JUNE 6, 1944.

Gamble, Read, Howland & Rosenfield, of Des Moines, C. A. Williams, Jr. and Irving C. Johnson, both of Oskaloosa, for appellants.

Truman S. Stevens, of Des Moines, for defendant appellee.

Brammer, Brody, Charlton & Parker, of Des Moines, for petitioner appellee.

GARFIELD, J.—The ultimate question is whether all or only half the remaining income from a trust estate of about $100,000

is payable to Drake University. This in turn depends on whether Penn College, beneficiary of the other half of the net income, has ceased to exist.

The trust was created by the will of Lottie R. Hagan, who died November 1, 1941. The will, made in 1930, as changed in 1938 by a codicil, contains certain legacies of personal belongings and $47,500 in money, $20,000 of which are to charitable objects—a church, a hospital for crippled children, and a children's home. The remainder of her estate was left in trust under these provisions:

"* * * the income of said trust fund remaining in the hands of my Trustees shall be divided equally and turned over to Drake University, Des Moines, Iowa, and Penn College, Oskaloosa, respectively, for the purpose of providing annual scholarships under terms and conditions elsewhere in this last will and testament fully set forth and described.

## Paragraph VII

"Each scholarship herein provided for shall be known as a 'Harry M. and Lottie R. Hagan Scholarship.' It is my request that the income only, as herein set forth, be used in providing annual scholarships of $200.00 which shall be awarded by Drake University and Penn College respectively, to worthy persons who are ambitious to receive a college education, and, who, without financial assistance, would be unable to pursue college work. Said scholarships may be used in any department of said institutions and in awarding said scholarships there shall be no discrimination on account of sex, creed, or color. *Should either Drake University or Penn College cease to exist, the income from said trust fund shall be turned over to the surviving institution for the purpose above set forth*, and should both of said Institutions cease to exist, my Trustees are hereby authorized to select some institution of higher learning in Iowa to which the income from said Trust fund shall be given for the purpose and on the conditions hereinabove set forth.''

The language more particularly involved here is that italicized by us.

Valley Savings Bank, of Des Moines, sole trustee under the will, filed its petition in probate alleging that Penn College has turned over its buildings and other property to William Penn College, which proceeded to operate a college in the same buildings, with the same faculty and under the influence of the same church organization; that uncertainty exists as to the true construction of the will and as to who should receive that portion of the income payable by the terms of the will to Penn College. The trustee asked the court to interpret the will and direct it as to how to apply the income.

Penn College and William Penn College answered the petition, denying that Penn College has ceased to exist but alleging that a new corporation has taken over the ownership and operation of the institution in order to provide for its continued existence, and while the name has been changed to William Penn College, the institution remains the same. Drake University filed answer, cross-petition, and petition of intervention, asserting that Penn College has ceased to exist as an educational institution, its assets have become the property of William Penn College, a wholly separate institution of learning, and that the full net income from the trust should be paid to Drake.

Upon the trial, the trustee offered in evidence the articles of incorporation of Penn College and those of William Penn College and rested. The remaining evidence was offered by Penn College and William Penn College. No question was asked any witness by counsel for Drake University. The lower court held that Penn College ceased to exist as an educational institution on June 5, 1933, and that Drake University is entitled to all the net income from the trust. Penn College and William Penn College have appealed. The trustee has filed nothing with us except a statement asserting its neutrality as between the claimants to the trust income.

There is no dispute in the facts. The institution formerly known as Penn College was established in Oskaloosa in 1873. Prior to June 5, 1933, it was owned and operated by a nonprofit Iowa corporation, whose affairs were managed by a board of thirty-one trustees, fifteen of whom were appointed by the Iowa Yearly Meeting of Friends, the governing body of the Society of

Friends in this state. The fifteen so chosen in turn elected fifteen additional trustees. The alumni association of Penn College had the privilege of nominating six of these additional fifteen. The thirty-first trustee was the president of the college.

In 1916 some of the college buildings and equipment were destroyed by fire. New buildings to replace those destroyed were erected at a cost of between $400,000 and $500,000. "All of that was raised except about $100,000, which was the debt that hung over the college * * * up to the critical time in 1931," when a mortgage for about $65,000 on the real and personal property of Penn College was made for the benefit of certain creditors.

In the winter and spring of 1933 the banks were closed and the college suffered from the effects of the depression. Supporters of the college were largely farmers whose situation was then desperate. The college had about $60,000 of gift notes that could not be collected. Nor was it able to borrow money. There were at least three judgments against Penn College, one for a teacher's salary. Some creditors were threatening to levy upon receipts of the college for tuition. The situation received the attention of almost the entire business population of Oskaloosa, the members of the Yearly Meeting of Friends, trustees, alumni, and other supporters of the college.

The minutes of the meeting held by the college trustees on March 6, 1933, recite:

"President Bedford made the suggestion that the Board consider the advisability of organizing a new corporation to be known as William Penn College. He pointed out that there were numerous friends of the college that hesitated to make donations to us due to the fact that they were unwilling to have their money used in the payment of old debts of the college. Furthermore, local opinion seems to be fairly uniform that our trusteeship is not adequate protection for our current funds, and that it would be possible for creditors to garnishee these accounts the same as the regular accounts. The setting up of a new corporation to lease the buildings and grounds from Penn College and operate the college would eliminate this danger. After considerable discussion the Board decided to go ahead

with the proposition exercising due care that no steps should be made which would give the public the idea that Penn College was attempting to evade its debts."

The joint expression of representatives of the Yearly Meeting of Friends, college trustees, and members of the community was that the only solution of the college's financial predicament was to organize this new corporation to take over the operation of the college. As directed by the trustees of Penn College, some of their members on March 22, 1933, filed articles of incorporation of William Penn College, which are substantially similar to those of Penn College. Control of both corporations is identical. The trustees of the new corporation are the same in number, chosen in the same manner as those of the older one. Since the formation of the new corporation the same individuals have been trustees of both corporations. The name was changed to William Penn College principally because there was a Pennsylvania College in the state of that name and it was thought best to prefix the word "William" to the name of the Oskaloosa institution.

On June 5, 1933, Penn College made a written lease of all its property to William Penn College at an annual rental of $3,000 for a period of ten years, with privilege of renewal for an additional ten years. In the lease the lessee agreed "to carry on the operation of the college according to its articles of incorporation." This lease was signed for Penn by Dr. B. F. Andrews as president and C. L. Haworth as secretary of its board, and for William Penn by the same individuals as president and secretary of its board. After June 5, 1933, William Penn College operated the institution. The summer session, commenced on or about that date, was attended by students who had previously arranged with Penn College to attend the session. The college never closed its doors. Teaching was not interrupted. The faculty, curriculum, physical plant, traditions, aims and objects of the institution all remained substantially the same.

In 1934, a beneficiary under the mortgage given by Penn College requested the trustees of the mortgage to foreclose it. This was done. The trustees under the mortgage bid in the mortgaged property at the foreclosure sale and assigned the sheriff's certificates to William Penn College, which received the

sheriff's deed to all the property. William Penn paid the indebtedness formerly secured by the mortgage and also the unsecured indebtedness, so that all debts of the college have been fully paid except current obligations.

The corporation known as Penn College has not ceased to exist. It has administered and received gifts. A number of donations to the college have been collected by the older corporation and turned over to the newer one. The alumni association of Penn College has also continued to function and to nominate six of the trustees of both the old and the new corporation. No other alumni organization has been formed.

The testatrix formerly lived in Oskaloosa. While she was not a member of the Friends church, her husband, her sister, and many friends had attended Penn College. Testatrix was married in 1909 and then went to Des Moines to live. In 1930, after her husband died and after she had made her will, she moved to California to live. She returned to Iowa only for a short visit in 1932. A codicil dated in 1938 made a number of important changes in Mrs. Hagan's will but no change was made in any provision here involved.

I. We find it unnecessary to decide whether appellants are entitled to a trial de novo in this court. The petition was in probate. At the outset of the trial, the court inquired whether the action was in equity or at law. One of appellants' attorneys said, "I think it is a probate action." Another attorney for appellants then suggested "that probate has no jurisdiction of a trust; it is entirely in the equity court." To this the court replied, "That is true," and proposed that evidence be taken subject to objection. The parties then agreed that rulings would not be made on objections to evidence and no such rulings were made.

Under these circumstances it is arguable that the case is here de novo and not merely for the correction of errors of law. In re Estate of Custer, 229 Iowa 1061, 1065, 295 N. W. 848, 851; In re Estate of Moore, 211 Iowa 804, 808, 232 N. W. 729; In re Estate of Jenkins, 201 Iowa 423, 426, 427, 205 N. W. 772. However, we reach the same conclusion, whether the cause is triable de novo or merely reviewable on errors of law. See In re Estate

of Clark, 228 Iowa 75, 99, 290 N. W. 13. The appeal presents nothing but questions of law. There are no disputed facts. The decision below cannot be affirmed on the theory that it has the effect of a jury verdict which is binding on us. That theory is not applicable here. If the court below erred, it was in its application of the law to the terms of the will and to undisputed facts. See In re Estate of Stuart, 184 Iowa 165, 170, 171, 168 N. W. 779; In re Estate of Smith, 223 Iowa 172, 175, 271 N. W. 888; In re Jordan's Estate, 310 Pa. 401, 165 A. 652, 653; Borchers v. Taylor, 83 N. H. 564, 145 A. 666, 63 A. L. R. 874, 876, 877.

II. In determining the meaning of a will the primary concern of courts is to ascertain the intent of the testator and give it effect unless contrary to some rule of law or public policy. Such intent is to be gathered from the will itself where the language is plain and unambiguous. In re Estate of Schmitz, 231 Iowa 1178, 1181, 3 N. W. 2d 512, 515, and cases cited; Smith v. Harris, 227 Iowa 127, 134, 287 N. W. 255; Anderson v. Anderson, 227 Iowa 25, 31, 286 N. W. 446. It is a familiar statement that in ascertaining the testator's intent the question is, what is meant by what the testator said, rather than what he intended to say.

Unquestionably this will creates a trust for a charitable purpose—the promotion of education. Wilson v. First National Bank, 164 Iowa 402, 412, 145 N. W. 948, Ann. Cas. 1916D, 481; Lupton v. Leander Clark College, 194 Iowa 1008, 1013, 187 N. W. 496; Restatement of the Law, Trusts, section 370; 10 Am. Jur. 631, section 64; 14 C. J. S. 444, section 15a. In ascertaining the meaning of a charitable trust, the language used is to be given a broad and liberal construction and one favorable to its purpose. Charitable gifts are strongly favored by the courts. In re Estate of Durham, 203 Iowa 497, 502, 211 N. W. 358, and cases cited; Beidler v. Dehner, 178 Iowa 1338, 1342, 161 N. W. 32; Reithmiller v. Carr, 137 Neb. 284, 289 N. W. 338, 340; 14 C. J. S. 437, section 11; 10 Am. Jur. 677, section 125.

It seems apparent from the language used that the provision of this will, "Should either Drake University or Penn College cease to exist," means "cease to exist as an educational institution." The will provides: "Said scholarships may be used in any department of said institutions * * * Should either

* * * cease to exist, the income * * * shall be turned over to the surviving institution * * * and should both of said Institutions cease to exist, my Trustees are hereby authorized to select some institution of higher learning in Iowa * * *."

That the bequest for the benefit of Penn College is to terminate only if it ceases to exist as an educational institution seems to be the construction of the will adopted by the parties themselves and by the trial court. Appellants presented this theory in their answer. Drake University pleaded that "Penn College has ceased to exist or do business as an educational institution," and "Penn College as an institution of learning has wholly and finally ceased to exist * * *." In argument here Drake asserts, "Penn College * * * does not exist as an educational institution." The trial court found that, "In June, 1933, Penn College closed its doors as an educational institution * * * Penn College has ceased to exist as an educational institution * * *."

The controlling question, therefore, is whether Penn College has ceased to exist as an educational institution. On this question it would seem that Drake has the burden of proof, since it affirms that Penn College has ceased to exist. In re Jordan's Estate, 310 Pa. 401, 165 A. 652, 655.

We think Penn College has not ceased to exist as an educational institution. It is not contended that the mere change of name to William Penn is important. Clearly, a college does not cease to exist merely by reason of a change in name. "Mere change of name, unless some peculiar affection for the name is indicated by the donor, means nothing * * *." Lewis v. Gaillard, 61 Fla. 819, 842, 56 So. 281, 288. See, also, Scott-Lees Collegiate Inst. v. Charles, 283 Ky. 234, 140 S. W. 2d 1060, 1063; Walsh v. Fidelity & Deposit Co., 131 Misc. 138, 227 N. Y. Supp. 96.

Nor, under the circumstances here, has Penn College ceased to exist as an educational institution merely because a distinct corporation has taken over the legal title and business management of the college. Indeed, the very purpose of effecting a nominal change in ownership and operation was to insure the continued existence of the institution of learning. We think such purpose has succeeded up to this time.

If testatrix had intended a mere change in name of the college or in its ownership and operation to terminate its right to a share of the trust income, she could easily have so stated. This she did not do. A court should not write such a provision into the will in lieu of its expressed terms. To do so would defeat the broad intent of testatrix that is manifest from the will itself. It is extremely improbable that she was concerned with maintaining inviolate the precise name of the institution or the identity of the corporation that owned and managed it.

Although cases of this nature are not exactly analogous, there is ample authority that tends to support our conclusion.

Starr v. Morningside College, 186 Iowa 790, 792, 173 N. W. 231, involved a bequest to "the endowment fund of the said Charles City College located at Charles City, Iowa, and that the same be in no manner used or disposed of by them." Charles City College merged with Morningside College at Sioux City and as a practical matter ceased to exist. We held there was no forfeiture of the bequest and that a demurrer to the petition, seeking to have a forfeiture declared, was properly sustained.

In Old Ladies Home v. Hoffman, 117 Iowa 716, 717, 89 N. W. 1066, 1067, there was a bequest " 'to an orphan asylum in the city of Muscatine, or, if no such asylum be then in existence in said city, the same is to go to a home for old ladies in said city.' " An orphan asylum located a mile outside the city limits and a home for old ladies within the city each claimed the fund. Both were organized with the bequest in view. We held the orphan asylum outside the city limits was entitled to the bequest; that the testatrix did not have in mind strict geographical lines; that the provisions, "in the city of Muscatine" and "in said city," should be construed to mean "at the city of Muscatine."

In John Robinson Hospital v. Cross, 279 Mich. 407, 412, 272 N. W. 724, 726, it was contended that a hospital had no claim to the income from a testamentary trust because it had ceased to exist as a charitable institution. When testatrix died the hospital was owned by a nonprofit corporation. Later, the title reverted to persons named in the deed under which the corporation held its title. These persons in turn sold the hospital to another doctor, who operated it for a time for profit. The hospital evidently closed for a short period. Later, this other

doctor and his two brothers formed another nonprofit corporation that took over the hospital. The court held in effect that the hospital had not ceased to exist "and the legacy has not lapsed by a change in ownership or management."

In re Jordan's Estate, 310 Pa. 401, 404, 165 A. 652, involved a charitable trust for the benefit of an academy, with the provision that if it "shall go out of existence as an academy or a college," the trust income should go to a certain church. The academy ceased to function in the building owned by it and made "a reciprocal teaching agreement" with another educational institution under which all instruction was conducted in the latter's building. It was held the academy had not gone out of existence and was still entitled to the trust income.

In Boston Safe D. & T. Co. v. Stratton, 259 Mass. 465, 473, 474, 156 N. E. 884, 887, there was a charitable bequest to an academy which was to be forfeited " 'whenever it ceases to be an institution of learning.' " The trustees of the academy "gave over to the town the entire control of the school." It was held there was no forfeiture of the bequest.

Curtis v. First Church, 285 Mass. 73, 75, 188 N. E. 631, 632, involved a charitable trust for the benefit of a church "and in case said church shall be discontinued or cease to maintain public worship as a separate and distinct organization, then said sums shall vest in" a certain academy. Later, the church was incorporated; all its property was conveyed to the corporation, which also absorbed another church and services were conducted in the edifice formerly owned by this other church. It was held the trust income was still payable to the church and not to the academy.

In none of the above cases was there resort to the cy pres doctrine. See, also, Scott-Lees Collegiate Inst. v. Charles, 283 Ky. 234, 140 S. W. 2d 1060; Lewis v. Gaillard, 61 Fla. 819, 56 So. 281; 14 C. J. S. 532, 533, section 66; annotation 63 A. L. R. 880.

It is our conclusion that Penn College has not ceased to exist within the meaning of the will but is being operated under the name William Penn College by the corporation of that name. The trustee is therefore directed to divide equally the remaining income from the trust fund between Drake University and

William Penn College. Scholarships in the Oskaloosa institution are to be awarded by William Penn College to the worthy persons entitled thereto under Paragraph VII of the will.— Reversed.

SMITH, C. J., and BLISS, OLIVER, HALE, MILLER, and MULRONEY, JJ., concur.

WENNERSTRUM, J., takes no part.